HERMAN R. and IRMA SIEMERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Siemers v. Commissioner
Docket No. 6323-75.
United States Tax Court
T.C. Memo 1977-221; 1977 Tax Ct. Memo LEXIS 217; 36 T.C.M. (CCH) 922; T.C.M. (RIA) 770221; July 18, 1977, Filed Herman R. Siemers, pro se. Edward P. Phillips, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined deficiencies in the Federal income taxes of petitioners as follows: Year
Deficiency
1971
$2,267.81
1972
699.22
Due to concessions of the parties, the only issues remaining for decision are as follows: 1. Whether petitioners are entitled to long-term capital gain on the proceeds they received from the sale of a lot. 2. Whether petitioners are entitled to a sick pay exclusion with respect to Herman R. Siemers in 1972 in the amount of $2,450.51 rather than the $2,556.83 claimed. FINDINGS OF FACT Some of the facts have been stipulated.
The stipulation of facts and the exhibits attached thereto *219 are incorporated herein by this reference. Petitioners Herman R. Siemers and Irma Siemers, husband and wife, filed Federal income tax returns for the taxable years 1971 and 1972 with the Southeast Service Center, Chamblee, Georgia. At the time the petition was filed, petitioners resided at Hilton Head Island, South Carolina. Herman R. Siemers will hereinafter be referred to as petitioner. Petitioner was employed by Sea Pines Plantation Company, hereinafter sometimes referred to as Sea Pines, during the years 1969 through 1972. He was primarily employed as a real estate salesman having a base salary of $10,500 a year with additional income from real estate commissions. On May 20, 1969, petitioner and Dennie L. McCrary, also an employee of Sea Pines, entered into an agreement with Sea Pines to acquire a parcel of property designated as Lot No. 20, Baynard Cove Road, Baynard Oaks Subdivision. This lot was located in the development of Sea Pines Plantation on Hilton Head Island. The purchase price for the property was $18,000. Petitioner and McCrary executed a promissory note dated May 20, 1969, in the amount of $18,000 in favor of Sea Pines. The note provided that the *220 principal and interest thereon were due November 20, 1970, with the interest accruing at the rate of eight percent per annum. The note also provided for a late charge in the event such payment was not timely. The agreement was executed on a standard Sea Pines sales contract. However, in lieu of the standard contract paragraphs numbered three through seven, the parties added certain additional wording as follows: 3. The property is being conveyed subject to the following mortgages: First Mortgage - First Federal of Savannah Second Mortgage - Travelers Insurance Company Third Mortgage - Sea Pines Plantation Company Upon payment of 45% of the purchase price in cash, the Sea Pines Plantation Company will release the property conveyed from the lien of the first and second mortgages. 4. Buyer agrees to execute a promissory note to the Company or its assigns for the full amount of the purchase price. This note in its entirety plus accrued interest at 8% will be paid to the Company on November 20, 1970. Unless Buyer is otherwise notified, this note will provide for prepayment without penalty. 5. If an employee leaves the Company before November 20, 1969, the Company *221 shall have an option to repurchase the property at the price set forth in Paragraph 2. 6. The standard 10% commission will be charged on resale of all lots. 7. The property is being conveyed with undivided interest where applicable. That same day petitioner and McCrary executed a mortgage to Sea Pines securing the promissory note of $18,000 through a transfer of the property to Sea Pines as security for the note. This mortgage was not recorded. Sea Pines formally conveyed the lot to petitioner and McCrary on April 29, 1971, by a deed dated and notarized on that date. This deed was recorded in the property records of Beaufort County, South Carolina, on June 2, 1971. On that same day petitioner and McCrary conveyed the lot to Francis H. May, Jr., for the sales price of $35,000. This deed was also recorded in the public records on June 2, 1971. The Sellers' Closing Statement dated June 15, 1971, reads as follows: Debit
Credit
Sales Price
$35,000.00
10% Sales Commission
$ 3,500.00
Documentary Stamps
108.50
Note
18,000.00
Interest on Note for
24 months at 8%
2,880.00
24 mo. Pro Rata Taxes
83.60
24 mo. Pro Rata Share
Maintenance
100.00
Net Proceeds
10,327.90
$35,000.00
$35,000.00
*222 Neither petitioner nor McCrary paid any of the interest or principal on the $18,000 note until closing. And neither of the sellers paid any of the taxes or maintenance fees on the property until they paid the accumulated taxes and charges at the closing. Ordinarily, Sea Pines required a purchaser of a lot to pay the taxes and maintenance fees as these amounts became due. On their Federal income tax return for 1971, petitioners reported gain in the amount of $5,163.95 as long-term capital gain from the sale of their interest in the lot. In 1972, petitioner was absent from work for two periods of time because of illness. The first period was from May 20, 1972, through June 7, 1972. The second period was from July 5, 1972, through December 31, 1972. On their Federal income tax return for 1972, petitioners claimed the amount of $2,556.83 as an exclusion from income for sick pay. Respondent determined that only $2,450.51 was allowable as a sick pay exclusion and disallowed the amount of $106.32 from the claimed exclusion. OPINION Petitioner, together with a fellow employee, signed an agreement to acquire a lot from their employer, Sea Pines. The purchase price of $18,000 *223 was in the form of a note secured by a mortgage transferring the property back to the employer. On April 29, 1971, when the resale of the lot was arranged, Sea Pines transferred the lot to the employees who, in turn, the same day transferred the lot to the final buyer. At closing, the employees paid off the note and the interest thereon and the taxes and maintenance fees owed on the property for the period which they had held rights in the property. Section 1222 [1] requires a holding period of more than six months in order for the gain to qualify as long-term. Respondent contends that petitioner does not meet that test because petitioner was actually the record owner of the property for less than one day. The date of transfer of legal title is not the sole criteria of acquisition. The date on which "the benefits and burdens or the incidents of ownership of the property" were acquired must also be considered. ; , affd. per curiam . *224 Respondent argues that the lot in question was not acquired by petitioner until a formal deed was issued and later recorded. The sales contract, respondent maintains, was only an executory contract which contemplated the future conveyance of the lot. As an executory contract, respondent argues that the courts of South Carolina would hold that this document did not operate to convey title to the subject property. In the alternative, respondent argues that the agreement between petitioner and Sea Pines was a "sham," designed solely to enable petitioner and McCrary to receive the appreciation in the value of the lot. And, consequently, petitioner never "held" the property at all. The wording of the standard form of contract used by Sea Pines contemplates that ownership of property will pass to the purchaser upon the execution and delivery of a formal deed to the property. However, the additional wording added to that form by the parties in paragraphs three through seven must take precedent. ; . *225 These additions treat the property as being presently conveyed and provide for the release of the property from the prior mortgages when 45 percent of the purchase price is paid. These additions also provide that the property may be repurchased by Sea Pines if the employee leaves before November 20, 1969. The intention of Sea Pines to convey "ownership" of the property to petitioner is further demonstrated by the fact that the form of mortgage executed as security for the $18,000 loan purports to convey the property back to Sea Pines. If the modified "sales contract" was not intended to convey an interest in the property to petitioner, then a conveyance back to the seller would have been unnecessary. The fact that none of these documents were recorded would only affect the rights of the parties to the agreements as to third parties. ; . Unquestionably, Sea Pines sold the property to petitioner and his fellow employee on terms which it would not offer to the ordinary buyer. Sea Pines clearly intended to provide *226 an additional incentive for its employees. By giving them an opportunity to acquire an interest in one of the prime building lots in the Sea Pines development, they would be able to participate in the future success of the development. However, this intention does not make the transaction a "sham" anymore than the granting of a stock option to an employee is a sham. While the petitioner and his fellow employee were not required to pay a down payment on the purchase of the lot, they were personally liable on the note and Sea Pines held title to the lot as collateral. The documents executed by the purchasers provided Sea Pines ample recourse in the event of default. During the period of their ownership, the purchasers were fully liable for all taxes and maintenance fees. These accumulated charges plus the interest and principal on the note were all repaid upon the resale of the lot. Consequently, the basic burdens of ownership rested on petitioner and his fellow employee. Petitioner and his fellow employee acquired equitable ownership of the property upon the execution of the contract of May 20, 1969. Under the laws of South Carolina, Sea Pines merely held a bare legal title *227 as security for petitioner's indebtedness. [2] Accordingly, we find that petitioner "held" the property as defined in section 1222 from May 20, 1969, the time of the signing of the initial agreement with Sea Pines. As a result, the gain resulting from the April 29, 1971, sale of the property is taxable as long-term capital gain. Petitioner presented no evidence as to respondent's adjustment in the amount of $106.32 for petitioner's exclusion from income for sick pay. Accordingly, we must sustain respondent's determination. . Decision *228 will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩
2. See Code of Laws of South Carolina, Title 45, section 45-51 (1962): § 45-51. Rights and title of mortgagor and mortgagee. -- No mortgagee shall be entitled to maintain any possessory action for the real estate mortgaged, even after the time allotted for the payment of the money secured by mortgage is elapsed, but the mortgagor shall be deemed the owner of the land↩ and the mortgagee as owner of the money lent or due and the mortgagee shall be entitled to recover satisfaction for such money out of the land by foreclosure and sale according to law. * * * [Emphasis added.]